UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMI HANNA ANTAR,<br><br>                              Petitioner,<br><br>v.<br><br>MARTIN FRINK, Warden,<br><br>                              Respondent. | Case No.:  18cv0118 BAS (BGS)<br><br>**REPORT AND RECOMMENDATION RE: DENIAL OF HABEAS CORPUS PETITION** |

## I.    <u>INTRODUCTION</u>

Petitioner Sami Hanna Antar Jones, a state prisoner represented by counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet.") challenging his July 27, 2015 convictions in San Diego Superior Court case no. SCS268104 for forty-two counts of first degree burglary, two counts of attempted first degree burglary, one count of conspiracy to commit residential burglary, and one count of receiving stolen property.  (Pet., ECF No. 1 at 1-6.)[1]  The Court has read and considered the Petition, [ECF No. 1], the Answer and Memorandum of Points and Authorities in Support of the Answer [ECF No. 11], the Traverse [ECF No. 16], the lodgments and

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

other documents filed in this case, and the legal arguments presented by both parties. For the reasons discussed below, the Court recommends the petition be **GRANTED.**

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).

This case involves a series of residential burglaries committed by Michael Venegas, Ronnie Fults, Ricardo Duron, Paula Aguirre and Jose Montes. Venegas appears to have been the ringleader of the group, while Montes and Aguirre acted as drivers and lookouts. Fults and Duron, accompanied by Venegas, physically entered the homes and stole property. Montes and Aguirre were the first to be arrested and became cooperating witnesses. Antar owned and operated a jewelry store in downtown San Diego. According to Montes and Aguirre, after almost every burglary Venegas would call or text Antar and they would drive downtown to Antar's store. Venegas would enter the building housing Antar's shop with the stolen property and return with cash. Following the arrest of Venegas and Fults, Antar's shop was searched. Some of the stolen property was found at the shop and photos of some of the stolen property were found on Antar's computer. The state appellate recounted the facts of the burglaries as follows:

Count 1:

Victim C.C. testified that on August 15, 2012, at about 2:15 p.m., she was notified that an alarm had been activated at her home located on Sundrop Court in Chula Vista. On inspection, C.C. found that a rock had been thrown through a window located on the side of the house; that someone had entered the home, ransacked it, and taken various items including jewelry; and that a pillowcase was missing from a bedroom pillow.

On the day of this break-in, a neighbor heard the C.C.'s home alarm sound and saw two men sitting in what the neighbor described as a light blue, 1960's Volkswagen Beetle parked across the street from the C.C. residence. Shortly thereafter, the neighbor saw a third man come from the direction of the C.C. residence holding a "bag of some sort," quickly get into the Beetle, and watched as the car sped off.

Montes testified that the C.C. home was the first one burglarized by him, Venegas, and Duron during the conspiracy; that, after they determined nobody was home, while he and Duron kept watch he saw Venegas jump a fence, then about a minute later, he heard glass breaking and an alarm sounding. About two minutes later, he saw Venegas exit the front door carrying a pillowcase full of jewelry.

Investigator Holmes testified that the cell phone records for this day showed a 15-second call from Antar's phone to Venegas's phone at 12:27 p.m.; that at around 2:09 p.m., there were two calls involving Venegas's cell phone that pinged off a cell tower near the C.C. home; and that later in the afternoon, phone records showed multiple calls involving the phones of Montes, Venegas, and Aguirre that accessed one or more cell towers "east of the [C.C.] house."

At 5:03 p.m. that same day, phone records showed an outgoing call from Venegas's phone to Antar's phone "pinging off of a tower near downtown" San Diego, where, according to Aguirre (see counts 3, 4, and 5, *post*) and Montes (see count 2, *post*), Antar's "store" was located and where Venegas, after almost every burglary, would meet Antar and exchange the loot for money. Phone records also showed call activity between the phones of Venegas and Antar at 5:13 and 5:19 p.m.

On this record, we conclude substantial evidence – as further summarized *ante* – supports Antar's conviction on count 1 under a conspiracy theory of vicarious liability. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 2:

Victim G.T. testified that her home located on Diamond Drive in Chula Vista was broken into on August 21, 2012; that she left home at about 1:00 p.m. and returned at about 5:00 or 6:00 p.m.; and that when she arrived home, she found clothes from her bedroom drawers scattered on the floor

and her jewelry box, which had been full and which included coins she had collected, empty. Also missing was $4,500 in cash G.T. intended to use to pay for new carpeting. As was the case in the C.C. break-in, G.T. found one of her pillowcases missing from a bedroom pillow. Also missing from G.T.'s home was a spare key to a Mercedes that she kept hidden in a drawer in the hall closet. In her daughter's room, G.T. found a screen from a window had been removed; her daughter's clothes also scattered on the floor; and her daughter's laptop and jewelry missing.

About a month after the break-in, G.T. one day returned home and found the sliding door and screen to her home open, as was the door leading from the garage to the house. G.T. testified that nothing was missing from the house as a result of this second entry; that she had been driving her Mercedes during both entries; and that in January 2013, she went to sheriff's station and identified a pair of earrings and a watch that had been taken during the initial break-in.

Montes testified that he recalled Aguirre was with him, Venegas, and Duron on this day; that it was Aguirre who knocked on the front door of the G.T. home; that he parked up the street from the home while he and Aguirre watched Venegas and Duron enter a side gate by the house; and that he specifically recalled they stole a laptop, multiple pursues, and jewelry from this home. After this burglary, they drove to Venegas's mother's home, where Venegas also lived, to sort through the items. Montes recalled Venegas on this day stated that "Sami" (i.e., Antar) was interested in buying "MacBook" computers.

When asked how they would get money from the stolen items, Montes testified that during the "week and a half" he was participating in the burglaries, about four or five times he drove Venegas and Duron, and sometimes Aguirre, to a jewelry store in downtown San Diego to meet "Sami," where Venegas alone entered the store with the stolen items and returned with cash. Montes further testified that Antar's jewelry store was located inside a brownstone building Montes identified as the "Jewelry [sic] Exchange."

Montes testified that, before they "load[ed] up the car with the stolen goods" and drove them downtown to Antar's store, Venegas called or text-messaged Antar to "alert" him they were on the way. Montes further testified Venegas sometimes would spend an hour or more with Antar inside the brownstone building. Because Venegas would be gone so long, Montes

stated they sometimes would become "impatient" and would text-message and/or call Venegas "asking him what [was] taking so long." Montes specifically recalled driving to the Jewelers Exchange on August 21 – the same day as the break-in of the G.T. residence – with a stolen MacBook.

Investigator Holmes testified the phone records for this day showed calls at 12:07 and 12:09 p.m. between Venegas's phone and one of Aguirre's phones. The records also showed myriad phone calls and/or text messages beginning at about 2:58 p.m. involving phones affiliated with Montes, Aguirre, and Venegas in the general area of the G.T. residence. At 4:28 and again at 4:57 p.m., the records showed incoming calls from Antar's phone to Venegas's phone; and beginning at about 5:25 until at least 6:17 p.m., the records showed activity for the phones of Montes, Aguirre, and Venegas in the downtown area, near Antar's store, where Venegas would meet Antar and exchange the loot for money while the other members of the conspiracy waited in the car. Finally, at about 7:33 p.m., the records showed an outgoing call from Venegas's phone to Antar's phone.

On this record, we conclude substantial evidence supports Antar's conviction on count 2 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Counts 3, 4, and 5:

These counts all took place on August 27, 2012. A.P. testified in connection with count 3 that he resided in a home located on Galdar Place in Chula Vista. At about 1:00 p.m. that day, A.P. received a phone call from his alarm company notifying him the backdoor and a window at his home had been compromised. A.P. testified the home had surveillance cameras that allowed him to view the inside, but no equipment to record what he saw. According to A.P., the only things taken from the home were "two sport jerseys" he kept in the closet.

On the day of this break-in, neighbor J.S. saw a light blue "old Volkswagen" pull up on the wrong side of the street and park in front of A.P.'s home. J.S. saw a female exit the vehicle and they made eye contact. J.S. surmised the female was a cleaning lady and was entering the home to clean. However, about 30 minutes later, J.S. noticed the "old Volkswagen" was gone. J.S. later identified the female from a photographic lineup, who police determined was Aguirre.

///

Montes recalled the burglary of the A.P. home. Montes "believe[d]" that they also may have stolen a car from the garage of this home.

S.T. [FN 4 omitted] testified that, in connection with count 4, she lived on Annadale Way in Chula Vista; that at about 3:00 p.m. that day, she returned home and found the door to the garage refrigerator open and "some stuff" on the floor; that the screen to the kitchen window had been removed; and that when she walked into her bedroom, she saw it had been ransacked and there were two large kitchen knives lying on her bed. S.T. immediately went outside and called 911. Once outside, S.T. saw her neighbor, who lived across the street, also "frantic[ ]" and on the phone.

S.T. testified that on inspection, she found several items missing from her home including multiple pieces of jewelry; a laptop computer; cell phones; a camera; foreign currency; and headsets. A few weeks after the break-in, S.T. went to a sheriff's station and identified some foreign coins and jewelry that had been taken during the break-in. About a year later, S.T. again went to a sheriff's station and was able to identify additional items taken in the break-in.

Neighbor A.G. testified that, when she went to pick up her mail on this day, she saw an older light blue Volkswagen parked nearby. A male was sitting in the driver's seat and a female with long hair was sitting in the backseat. A.G. subsequently identified the female in a photographic lineup, who police determined was Aguirre.

Forensic evidence technician Michelle Hefty testified that she was part of a team of law enforcement that responded to the S.T.'s residence on the day of the break-in; that she was able to lift several prints from the sliding glass door in the living room; that the prints were lifted both from the interior and exterior of the door; and that the prints were then impounded. Mary Kay Hunt, a latent print examiner with the Chula Vista Police Department, determined two latent prints taken from the door matched the right thumb of Aguirre.

Montes recalled burglarizing the S.T. home. Montes further recalled Aguirre entered the S.T. residence along with Venegas and Duron.

Aguirre, age 22 at the time of trial, testified that she was charged with 24 counts of residential burglary, and ultimately pleaded guilty to eight counts of aiding and abetting residential burglary; that she was involved in

18cv0118 BAS (BGS)

these burglaries between about July and late-November 2012; that her youngest child was fathered by Venegas; and that she agreed to cooperate with law enforcement because she was young, had kids, and felt it was the "right thing to do."

Aguirre estimated that during the July/November time period, at least four or five days "every week" she participated in residential burglaries. Aguirre stated that she became involved in the burglaries because she wanted to "hang out" and "be with" Venegas; and that she met Duron through Venegas.

With respect to count 4, Aguirre said she had been waiting in Montes's car with Montes while Venegas and Duron went into the home. A few minutes later, Venegas called Aguirre and asked her to join them because they wanted her to "squeeze in through a [crack] in the sliding glass door." When Aguirre was unable to do so, Venegas went in through the kitchen window and then opened the door for Aguirre. Once inside, Aguirre saw Venegas looking through drawers for jewelry while Duron went to the closet. Aguirre, who was the only one not wearing gloves, helped Venegas put items in a backpack, and they left. Although Aguirre returned to Montes's car, Venegas and Duron went across the street and burglarized the neighbor's home (i.e., count 5).

T.M. testified in connection with count 5 that she and her family also resided on Annadale Way; that she left the house that morning at about 10:00 a.m. and returned at about 3:00 p.m.; that when she arrived home, she found the front door open and all of their "things . . . thrown across the floor – pictures, papers, items"; that a window in the dining room had been opened and its screen removed; and that a sliding glass door in the living room area also had been opened.

Upstairs, T.M. found her bedroom had been "ripped apart." Like many other victims, T.M. found pillowcases missing from pillows and kitchen knives in her bedroom. Specifically, T.M. testified that there were about seven "steak" knives lying on her bed; that the bedroom mattresses were flipped over; that her bedroom closet was ripped apart; that the drawers in two bedrooms were emptied; that a fire safe was opened and its contents, including jewelry and coins, were taken; and that items were also taken from the garage including expensive military gear used by her husband.

///

A few weeks after the break-in, detectives contacted T.M. about property they found in Montes's Beetle after it was impounded. On inspection, T.M. identified two coin sets belonging to her children and a watch belonging to her husband. T.M. later learned some coins stolen during the break-in were at a pawnshop. T.M. found the coins and purchased them because of their sentimental value.

Aguirre recalled the burglary of the T.M. home. She testified that Venegas and Duron returned with a "military backpack" and that Venegas talked about stealing "military gadgets" such as "night-vision goggles" from the home. Immediately after this burglary, Aguirre stated they all went "downtown" to the "Jewelers Exchange" so that Venegas could meet "Sam" (i.e., Antar).

Like Montes, Aguirre testified that Antar and Venegas had a "personal relationship;" that while they were all in the car, Venegas alone would use his cell phone to contact "Sam"; that when "Sam" responded, they would head downtown after "*[a]lmost every single [burglary]*" with the loot (italics added); and that only Venegas would take the loot inside and meet with "Sam" while everyone else remained in the car. Aguirre estimated Venegas spent about 30 to 40 minutes, and sometimes an hour, inside with Antar, and then returned with money.

Aguirre testified that typically after a burglary, the items stolen would be sorted by Venegas either in the car or at his home, where he lived with his mother; and that she never burglarized a home alone, but rather Venegas and Duron were always present during the burglaries.

Investigator Holmes testified that on this day, phone records showed there was an incoming call from Antar's phone to Venegas's phone at 9:50 a.m. and that at 11:07 a.m., there was an outgoing call by one of Aguirre's phones that accessed a tower "directly south" of the A.P. residence.

Phone records further showed an outgoing call from Venegas's phone to Montes's phone at 12:34 p.m.; an outgoing call involving Aguirre's phone that accessed towers "somewhat close" to the S.T. and T.M. residences; and an incoming call from Aguirre's phone to Venegas's phone at about 1:17 p.m. At 3:08 p.m., there was a call lasting 30 seconds from Venegas's phone to Antar's phone. That call accessed a tower at the intersection of the 805 and 54 freeways. At 4:44 p.m. there was an incoming call from Antar's phone to Venegas's phone; and at 5:29 p.m. there was an outgoing call from

Venegas's phone to Antar's phone lasting 30 seconds, "followed by an incoming call from the Antar phone to the Venegas phone [also] at 5:29 p.m." lasting one minute 35 seconds.

On this record, we conclude substantial evidence supports Antar's conviction on counts 2, 3, and 4 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Counts 6 and 7:

Counts 6 and 7 both took place on August 28, 2012. T.Mo. testified in connection with count 6 that he resided on Rue Michelle in Chula Vista; that he left for work at about 8:00 a.m. that morning and when he returned at about 3:00 p.m., he found his garage door open and his Mercedes Benz missing; that when he entered the residence, he found each room had been "ransacked"; that all of his wife's jewelry and his watches were missing from their bedroom; and that also missing from the home were cameras and a laptop computer, among many other items.

About a week after the break-in, police found T.Mo.'s car in San Ysidro, near the United States and Mexico border. About two months later, T.Mo. was asked to attend a property viewing of items recovered by detectives. T.Mo. testified he identified his wife's ring, which had been taken during the break-in.

Montes could not recall burglarizing this home. However, neighbor R.H. testified he lived near the B.B. home and, on the day of the break-in, he saw a light blue VW Beetle parked in front of the house, which he found "highly unusual." Inside the car R.H. saw three Hispanic-looking males. R.H.'s wife took down the license plate of the Beetle, which was provided to law enforcement.

A day or two after the B.B. burglary, Chula Vista police pulled over Montes while he was driving in his Beetle. Police impounded the car because Montes was driving on a suspended license. A search of the car revealed several watches (only one of which belonged to Montes); a Mercedes Benz car key; foreign coins; a laptop; and jewelry found under and behind the seat. Police also found a store receipt showing Montes had sold some coins.

///

Montes was arrested on April 11, 2013, and charged with six burglaries. Initially, Montes lied to police about his involvement in the burglaries but as noted ante, he later agreed to cooperate with law enforcement.

Investigator Holmes testified that on this day, phone records showed an outgoing call from Venegas's phone to Antar's phone at 10:25 a.m. lasting two minutes eight seconds that connected to a cell tower near Venegas's (mother's) home. The records further showed an incoming call from Aguirre's phone to Venegas's phone at 4:22 p.m., which accessed a cell tower about a mile away from the B.B. residence, and an outgoing call from Venegas's phone to Antar's phone at 4:50 p.m. lasting for 42 seconds that accessed a cell tower about a quarter-mile north of Venegas's home. At 5:10 p.m., records for Montes's phone showed an outgoing call accessed a cell tower near the Jewelers Exchange in downtown San Diego, where Venegas and his crew would take the loot after a burglary, and when Venegas alone would meet with Antar and return with money.

On this record, we conclude substantial evidence, and the inferences to be drawn from such evidence, supports Antar's conviction on counts 6 and 7 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 8:

E.L. testified that on September 12, 2012, he resided in a home located on Santa Maria Court in Chula Vista. At about 3:00 p.m. that day as he was leaving in his car, E.L. saw two Hispanic males in front of his home. E.L. estimated the males were in their late 20's. E.L. returned about an hour later, at the same time his wife separately arrived home. When E.L.'s wife went into the house, she found muddy shoe prints in the dining room area and on the stairs, which she initially blamed on E.L. On investigation, E.L. saw the blinds on a window in the dining room had been "pushed out," shards of glass were lying on a table, and a "big, solid rock" used to break the window was also on the table.

Inside the master bedroom, E.L. found everything was "tossed and turned." E.L. testified that "hundreds of pieces" of his wife's jewelry they kept hidden in one of their dressers was stolen. Also stolen was a jewelry box in which E.L. kept watches, bracelets, cufflinks, and "military

///

paraphernalia." Like many of the other homes burglarized, E.L. found a pillowcase missing from a bedroom pillow.

Aguirre was shown some text messages between her, Venegas, and Duron dated September 12, 2012. In one message, Aguirre informed Venegas and Duron she had just knocked on someone's door. In response, Duron instructed Aguirre, " '[address] knock on that one, too.' "

Per Investigator Holmes, phone records showed an outgoing call on Venegas's phone at 3:37 p.m. that accessed a cell tower near the E.L. residence on Santa Maria Court.

On this record, we conclude the evidence in connection with count 8, when considered in light of all the other evidence, and the inferences to be drawn from such evidence, supports Antar's conviction on count 8. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 9:

V.A. testified that on September 19, 2012, he resided in a home located on Via Hacienda in Chula Vista; that he left his home at about 1:00 p.m. to pick up his granddaughter from school; that as he was dropping off his granddaughter at about 3:30 p.m., his daughter informed him the alarm company had called and advised her that V.A.'s house alarm had been activated; and that he immediately drove home, opened the front door, and saw "glass scattered" everywhere, as if there had been an "explosion." Like many of the other break-ins, V.A. saw a sliding glass door in the family room had been shattered with a brick, which was lying on the floor.

In the dining room area, V.A. found desk papers scattered all over the floor. Inside the master bedroom, V.A. discovered all of his wife's jewelry had been stolen. Also stolen were watches; a souvenir knife collection; a $2 bill from Singapore; and his red Acura, which he kept in the front driveway. Police recovered the Acura about three days after the break-in. V.A. noted the sound system in the car had been damaged, as had one of the seats.

In summer 2013, V.A. went to a sheriff's station to view various items of property recovered by law enforcement. V.A. was able to identify the $2 bill and one of the knives he kept in his nightstand.

Aguirre was shown a text message dated September 19, 2012, in which she wrote Venegas, "'where are you[?]'" Aguirre testified she sometimes would message or call Venegas when he was taking too much time inside a home or to warn him about someone coming or something being amiss.

Cell phone records showed a call that day from Antar's phone to Venegas's phone at 11:52 a.m. lasting one minute 34 seconds. At about 2:37 p.m., phone records showed an outgoing call from one of Aguirre's phones that accessed a cell tower about half a mile from the V.A. residence. At 3:21 p.m. there was a call from Antar's phone to Venegas's phone lasting 59 seconds, which accessed a tower about a quarter of a mile from the V.A. residence. At 4:47 p.m., Aguirre's phone received an incoming call that accessed a tower near the Jewelers Exchange in downtown San Diego, where Venegas and his crew traveled after almost every burglary so that Venegas could meet Antar and exchange the loot for money.

On this record, we conclude substantial evidence supports Antar's conviction on count 10 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 11:

L.L. testified that she resided in a home located on Tim Street in Bonita on October 10, 2012; that she left the residence at about 10:00 a.m. and returned a few hours later; that on returning, she found the front door open and papers on the stairway; that when she went into the kitchen, she found the screen covering the window had been cut; and that when she went into the master bedroom, she found "everything [was] scattered."

On investigation, L.L. testified her jewelry and her husband's jewelry was stolen, as was the "pink slip" and a car key to her Mercedes Benz. Like many of the other victims burglarized in the conspiracy, L.L. found kitchen knives on a table next to the bed and on the bed itself, and a pillowcase missing from a bedroom pillow.

Aguirre recalled the L.L. home from its long driveway. Aguirre further recalled Venegas and Duron going into this home and returning with "a lot of gold" including "chains, necklaces, rings [and] bracelets." Aguirre specifically recalled Venegas bragged about how much gold they had stolen from this particular home, noting they had hit the "jackpot." A photograph

from Aguirre's cell phone taken at 2:23 p.m. on the same day of the L.L. burglary showed Venegas wearing three gold chains ostensibly stolen from this home.

Aguirre testified there was a "gap" between the end of September and the beginning of October 2012 when they were not burglarizing homes because she and Venegas had a falling out after Aguirre learned she was pregnant with his child. She further testified that, when she was arrested on November 28, 2012, after a police chase (discussed *post* in connection with count 35), police found a "pink slip" in Aguirre's car that had been stolen from the L.L. home.

Cell phone records for this day showed an outgoing call from Venegas's phone to Antar's phone at 2:17 p.m. lasting one minute 25 seconds that connected to a cell tower a mile west of the L.L. residence. At about 2:56 p.m., Aguirre received a call on one of her cell phones that accessed a tower in downtown San Diego, near the Jewelers Exchange. At 5:52 p.m. there was an outgoing call from Venegas's phone and at 5:55:39 p.m., there was an incoming call from Antar's phone to Venegas's phone that lasted only two seconds. However, 10 seconds later, the records showed an incoming call from Antar's phone to Venegas's phone lasting two minutes one second.

On this record, we conclude substantial evidence, and the inferences derived therefrom, supports Antar's conviction on count 11 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 12:

C.S. testified that on October 16, 2012, she resided in a home located on Camino Elevado on the border of Chula Vista and Bonita; that when she returned home from work at about 4:30 p.m. that day, she opened her garage door and found a bicycle displaced on the floor; that she opened her door to the family room and saw a "big mess"; that an aluminum block she kept outside had been thrown through a window in her home office, scattering glass on the floor; that in several of the rooms, items were taken out of drawers and thrown onto the floor; and that many precious heirlooms that had been in her family for generations had been stolen.

/ / /

18cv0118 BAS (BGS)

C.S. estimated that she lost close to $50,000 in jewelry and foreign currency, which she had collected in her travels. Like many of the other burglary victims, C.S. stated a pillowcase from a bedroom pillow was missing. After the break-in, C.S. went to a sheriff's station on at least two occasions and also viewed pictures at least once in an attempt to identify some of the stolen items. C.S. identified a gold bangle bracelet; some crystal; two plates; a specially ordered thumb drive; and what she described as some "junkie stuff." According to C.S., the items recovered and returned to her were of minimal value in contrast to the items that were stolen.

Cell phone records showed phone activity that day between Venegas's and Duron's phones at 2:44 p.m. near the C.S. residence. In addition, at 4:31 p.m. there was an incoming call from Antar's phone to Venegas's phone lasting 25 seconds; and at 4:44 p.m., there was an incoming call from the Duron phone to the Venegas phone that accessed a cell tower in downtown San Diego, near the Jewelers Exchange where, according to Aguirre and Montes, Venegas alone would meet Antar and exchange the loot for money.

On this record, we conclude substantial evidence supports Antar's conviction on count 12 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 13:

Chula Vista Police Officer Carlos Marques testified that he was on patrol in the evening of October 17, 2012, when he was dispatched to a home on Huerto Place in Chula Vista; that Officer Marques contacted the homeowner, A.M.; and that once inside, it appeared the home had been "ransacked" as "[d]rawers were out, clothing [was] on the floor, various items throughout the – on the floors, beds." On the north end of the house, Officer Marques found a bedroom window had been smashed, ostensibly by a "roof tile" that was lying nearby on the ground.

Cell phone records for October 17, showed an incoming call from Antar's phone to Venegas's phone at 1:27 p.m.; and phone activity between Aguirre's phone and Venegas's phone at 2:36 p.m. that accessed a cell phone tower about a mile south of the A.M. residence. At 3:40 p.m., there was an incoming call from Antar's phone to Venegas's phone; at 4:14 p.m. there was a call lasting 33 seconds from Venegas's phone to Antar's phone; and at 4:43 p.m., there was an outgoing call from Venegas's phone that

///

accessed a cell tower in downtown San Diego, near Antar's "store" in the Jewelers Exchange where Venegas and Antar always met.

On this record, we conclude substantial evidence supports Antar's conviction on count 13 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Counts 14 and 15:

Both of these counts took place on October 19, 2012. In connection with count 14 involving attempted first degree burglary, retired San Diego Police Officer D.H. testified he then resided on Encantada Court in Chula Vista; that after he arrived home that day, someone rang the doorbell over and over again for about 20 to 30 seconds, as if the person was in "panic mode"; that when he peeked out the window, he saw an unrecognizable white Cadillac parked in his driveway; and that he then went to the front door and saw a Hispanic female at the door, whom he also did not recognize. As a result, D.H. neither answered the door nor alerted the female to the fact he was home. A short time later, D.H. saw the white Cadillac leave the cul-de-sac.

About 10 minutes later, D.H. heard a loud "banging" noise at the back of his home. D.H. testified that when he had come home, he had opened a sliding glass door but had purposely kept the screen closed; that on investigation, he saw the screen door had been opened about a foot; and that he then went outside but saw nobody. About an hour later, a neighbor contacted D.H. D.H. went to the neighbor's home and saw "[e]verything was kind of messed up and out of place."

Aguirre testified she recalled the D.H. home, which had an American flag hanging "in front." Aguirre drove her pearl white Cadillac, which she had purchased in mid-August 2012, to this home and, at Venegas's request, rang the doorbell and then reported back to Venegas and Duron that nobody had answered. When Duron left and then returned to the car, he told Aguirre as soon as he had opened the back door to this home he saw someone inside, walking down the stairs. Duron thus quickly returned to the car.

J.C. testified in connection with count 15 that he resided in a home located on Encantada Court in Chula Vista, next door to the D.H. home; that on the day of the break-in, he left home at about 1:30 and returned at about 4:00 p.m.; that as he went inside, he found bags of new clothing by the front door, which previously had been upstairs; that there was a similar bag on top

of the car parked in the garage; that the hood to the car was open, as was the driver's side door; that everything in the living room had been thrown around; and that one of the screens to a window in the back of the house had been removed and the window opened. Before the break-in, J.C. estimated he and his wife had about 12 such bags of clothing. After the break-in, his wife found only two such bags upstairs.

Besides bags of clothes, items taken from J.C.'s home included a bracelet that was in his son's bedroom; his wife's gold necklace; some jewelry including a rosary; and $560 in cash among other items. Also taken was the family's two-month-old German Shepherd puppy.

Aguirre testified when Venegas returned from the J.C. home he stated it was full of new clothes and not worth the money to carry all of them out to the car. As they were driving away, Aguirre recalled seeing a German Shepard puppy running toward them. At Duron's request, Aguirre stopped the car and Duron, in response, called out to the dog. When the dog approached the car, Duron picked it up and they drove off.

A photograph taken from Antar's computer discovered as a result of the December 3, 2013, search of his "store" showed a rosary sitting atop a laptop matching Antar's laptop computer. The photograph was taken at 5:25 p.m. on October 19, 2012 – the same day the J.C. home was burglarized and a rosary was taken.

Investigator Holmes testified that cell phone records for counts 14 and 15 showed an incoming call from Antar's phone to Venegas's phone at 12:57 p.m. Between 3:48 and 4:01 p.m., there were four calls from Duron's phone that accessed a cell tower about a "quarter mile or less" from the D.H. and J.C. residences.

On this record, we conclude substantial evidence supports Antar's conviction of attempted first degree burglary as charged in count 14 and of first degree burglary as charged in count 15 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 16:

R.R. testified that on October 23, 2012, she resided in a home located on Choc Cliff Drive in Bonita; that on this day, she left the house at about

10:30 a.m. and went to visit her husband in the hospital; and that when she returned with her daughter at about 9:00 p.m., they found the lights in the garage on and the door to the house unlocked. On entering the home, R.R. found her husband's old wallet on the floor. R.R. also found a screwdriver had been left on a table by the stairs. When she went to the back of the house, she found the French doors leading to the patio had been "pushed in" and "broken."

Inside the master bedroom, R.R. found all of her belongings "thrown on the floor" and "all over the place." Like many of the other homes burglarized in the conspiracy, R.R. found missing a pillowcase from one of the bedroom pillows. Also taken was her jewelry and a small safe that contained important papers.

Aguirre recalled the R.R. home from its driveway and the steps to the front door. Aguirre further recalled Duron and Venegas stole a safe from this home. Afterwards, Aguirre testified that they all went to Venegas's home, where they used a drill to open the safe.

Investigator Holmes testified cell phone records from this date showed an incoming call from Antar's phone to Venegas's phone at 11:29 a.m. At 1:31 p.m., a call from Venegas's phone to one of Aguirre's phones connected to a cell tower about a mile south of the R.R. residence. The records further showed an incoming call from Antar's phone to Venegas's phone at 3:15 p.m. lasting 43 seconds, which accessed a tower about a quarter-mile east of Venegas's home, and an incoming call to Duron's phone at 3:53 p.m. that accessed a cell tower in downtown San Diego, near the Jewelers Exchange where Antar's "store" was located and where Antar would meet Venegas after almost every burglary.

On this record, we conclude substantial evidence supports Antar's conviction on count 16 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 17:

G.L. testified that on October 24, 2012, he resided in a home located on Oakpoint Avenue in Chula Vista; that when he returned from work that day at about 5:00 p.m., he found his sliding glass door in the back of the house "totally shattered"; that on top of the kitchen table was a rock from his backyard that had been used to break the glass; and that the inside of his

house was "[a]ll ransacked." In particular, G.L. stated the dresser drawers in the bedroom were "torn out," his clothes were scattered across the floor, and the mattress was "tossed over." Missing from the house were signed baseballs G.L. collected; jewelry; and a laptop computer. A few months after the break-in, G.L. went to a sheriff's station but could not identify any items taken from his home. At some later point, he was shown photographs that included some of the signed baseballs that had been stolen from his home on October 24.

Aguirre recalled the burglary of the G.L. home from the "old baseballs" they had stolen.

Investigator Holmes testified that cell phone records from this date showed an outgoing call at 2:45 p.m. from one of Aguirre's phones that accessed a cell tower about a mile and a quarter from the G.L. residence. At 2:51 p.m., there was an incoming call to Venegas's phone from Antar's phone lasting one minute 21 seconds, which accessed a tower about a mile from Venegas's home.

On this record, we conclude substantial evidence – and the inferences to be drawn from such evidence – supports Antar's conviction on count 17 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 18:

P.F. testified that on October 25, 2012, she resided in a home located on Kent Street in Chula Vista; that as she approached the home at about 7:45 p.m., she saw the garage door and the door leading to the inside of the house open; and that she then noticed her parents' car, which had been parked in the garage, was gone. P.F. noted the mailbox in the front of the house was "totally off the bolts on the sidewalk, it was scraped on the side, and was pushed over" near some bushes. P.F. immediately called 911.

From the outside, P.F. saw a screen missing from a window in the master bedroom. After the home was secured, she went inside and found a scrape on the wall in the hallway and her parents' room "ransacked." On the floor in her parents' room, P.F. saw a blue-lined gun case had been opened, with the gun missing.

///

P.F.'s father, A.F., testified that his daughter lived at the family home; that he owned a commemorative weapon, which he kept in a blue-lined gun case; that the car taken from the home was recovered the same day as the break-in; that a handicap placard he kept inside the car was missing when the car was recovered; and that also taken from the house were three firearms, $4,000 in cash, a Rolex watch, and myriad "Marine Corps commemorative coins."

Aguirre recalled the burglary of the P.F. home from the "little trailer parked" in the front. Aguirre remembered driving Venegas and Duron to this home in her Cadillac. Items subsequently recovered from Aguirre's car were traced back to the P.F. burglary.

Investigator Holmes testified that cell phone records from this date showed an incoming call at 10:29 a.m. from Antar's phone to Venegas's phone lasting one minute 27 seconds. At 3:32 p.m., phone records showed an outgoing call from Duron's phone that connected to a cell phone tower about three-quarters of a mile south of the P.F. residence. Beginning at 4:58 p.m., the records showed three incoming calls in rapid succession to Venegas's phone that accessed a cell tower in downtown San Diego, near Antar's "store" in the Jewelers Exchange. Finally, at 8:49 p.m. there was incoming call from Antar's phone to Venegas's phone.

What's more, a photograph of a shotgun with a United States Customs logo taken on October 25, 2012 – the same day as the burglary of the P.F. residence – was found on Antar's computer. The photograph was taken with a smartphone and the GPS coordinates showed it was snapped about a "mile" from Kent Street, where the P.F. home was located.

Also found on Antar's computer was a photograph of a gun with a "US Customs Special Agent label." Like the first, this second photograph was taken on October 25. The GPS coordinates of the second photograph showed it was snapped in the "same area" as the first photograph, but it appeared that, whomever took the picture with a smartphone, was moving in a "westbound" direction.

Another picture of a "black and white design" was also found on Antar's computer and was taken at 4:18 p.m. on the same day the P.F. home was burglarized. Like the first and second photographs, the third photograph was snapped in the "same general area" using a smartphone, and, based on GPS coordinates, showed further movement in a westbound direction.

On this record, we conclude substantial evidence supports Antar's conviction on count 18 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 19

A.A. testified that on October 31, 2012, she resided in a home located on Wheeling Lane in Bonita; that when she came home at around 2:30 p.m., she found the "whole house" had been "ransacked"; that drawers "were pulled out, clothes [were] everywhere," and items that had been on the cabinets "were knocked down, like literally everything was everywhere"; that a diamond ring and some costume jewelry were taken; and that the door to her parents' room, which she kept locked, was broken. Inside her parents' room, A.A. found two large butcher knives on the floor.

A.A.'s mother, M.A., confirmed that the family home was broken into on October 31; that her daughter A.A. and her own mother were the first to discover the break-in; that on inspection, M.A. found all her jewelry had been stolen, including her wedding ring, a black pearl necklace, and a gold chain necklace; and that some expensive purses and $400 in cash were also missing. M.A. stated at some point after the break-in, they went to a sheriff's station to view items recovered by police. She only identified a single black pearl earring belonging to her.

Investigator Holmes testified that cell phone records from October 31, 2012, showed an outgoing call from one of Aguirre's phones at 1:44 p.m. that accessed a cell tower less than a quarter-mile west of the A.A. residence. At 2:22 p.m., a call was placed from Venegas's phone to Antar's phone lasting 38 seconds, which accessed a cell tower about a mile and a quarter from the A.A. home. Beginning at 3:07 p.m., there were four calls from Venegas's phone that accessed a cell tower in downtown San Diego, near the Jewelers Exchange where Venegas and Antar would meet after the burglaries.

On this record, we conclude substantial evidence supports Antar's conviction on count 19 under a conspiracy theory of vicarious liability. (See *Covarrubias*, supra, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

/ / /

/ / /

Count 20:

S.K. testified that on November 1, 2012, she resided in a home located on Redlands Place in Bonita; that when she arrived home that day, a neighbor informed her that her house had been burglarized; and that when she entered the home, like many other victims she found a back bedroom patio door had been smashed and her bedroom "completely trashed." Missing from the house was a "great deal of jewelry," including a collection of opals, and a tablet.

S.K. was invited by detectives to a property viewing in both 2013 and 2014. At the first viewing in 2013, she was unable to identify any of her missing property. At the second viewing in 2014, she identified a silver necklace and bracelet; a few pieces of costume jewelry; and a turquoise silver ring.

According to investigator Holmes, cell phone records for this date showed an incoming call at 8:43 a.m. from Antar's phone to Venegas's phone; an outgoing call from Venegas's phone to Antar's phone at 11:02 a.m. lasting one minute 22 seconds; and a minute later, an outgoing call from Venegas's phone to Fults's phone. Both of these calls accessed the same cell tower. At 2:51 p.m., Venegas's phone received an incoming call that connected to a tower about a quarter-mile west of the S.K. residence.

Beginning at 3:10 p.m., cell phone records further showed three outgoing calls all within a few seconds of each other from Venegas's phone to Antar's phone that connected to a tower about a quarter-mile from the Jewelers Exchange, where, according to Aguirre and Montes, Venegas would go and exchange the loot for money. Also at 3:10 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting one minute 15 seconds; and another call from Venegas's phone to Antar's phone at 3:12 p.m. lasting 43 seconds.

On this record, we conclude substantial evidence supports Antar's conviction on count 21 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Counts 22 and 23:

Counts 22 and 23 took place on November 2, 2012. C.M. testified in connection with count 22 that she resided at a home on Southview Circle in Chula Vista; that on this day, she stayed home sick; that while her children

18cv0118 BAS (BGS)

were napping, she heard the doorbell ring; that because she was not feeling well, she ignored it until someone started "pounding" on the front door; that because she did not want her children awakened, she went downstairs, peeked outside, and saw a female knocking on the door; that the female was petite, in her early 20's, had dark hair and a large, "very elaborate," "colorful" tattoo on her arm/shoulder area; and that when she opened the door, the female asked for a person C.M. did not recognize.

Shortly after C.M. returned upstairs, she heard a "really loud noise." She went back downstairs, looked out the window, but saw nothing. Later that afternoon, C.M. learned there had been a burglary at her neighbor's house, the J.S.'s (i.e., count 23). A few months after this incident, C.M. was contacted by detectives. After being admonished, C.M. was shown a photographic lineup and identified photograph No. 2 as the female who had banged on her door on November 2. That female was Aguirre.

J.S. testified in connection with count 23 that, shortly after 2:00 p.m., he and his wife left their home and headed out of town; and that about 20 minutes later as they were driving, the alarm company called and informed him various "sensors" had been activated in the home. As a result, they returned home to find police cars parked in front of their house. After deactivating the alarm, J.S. saw the back sliding glass door had been shattered. J.S. also noticed a fresh "oil stain" in the driveway. On inspection, J.S. found a "dent" in a patio chair, which he surmised had been used to smash the glass door.

Inside the master bedroom, J.S. found all the clothes had been pulled out of drawers, and his wife's jewelry boxes empty. Also taken was a duffle bag.

J.S.'s wife, S.S., testified "gold shells," bracelets, and various other items of jewelry were stolen during the break-in; that at some later point, perhaps January 2013, a detective contacted her and showed her some pictures of items that had been recovered in a car; and that from these pictures, she identified bracelets, a couple of rings, and a medallion that belonged to her.

Cell phone records for November 2, 2012, showed an outgoing call from one of Aguirre's phones accessing a cell tower about three-quarters of a mile from Fults's residence located in the Spring Valley area. At 2:26 p.m., there was an incoming call to Venegas's phone that accessed a cell

22

tower about a mile north of the C.M. and J.S. residences and at 3:58 p.m. there was an outgoing call from Venegas's phone to Antar's phone lasting 33 seconds. Finally, at 4:15 p.m., records showed an incoming call from Fults's phone to Venegas's phone that accessed a cell tower about a quarter of a mile from the Jewelers Exchange, where, according to coconspirators Aguirre and Montes, Venegas would go to meet Antar to exchange the loot for money.

On this record, we conclude substantial evidence supports Antar's conviction for attempted first degree burglary in count 22 and for first degree burglary in count 23 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 24:

K.D. testified that, on November 5, 2012, she and her husband, D.D., were residing in a home on Bonita Woods Drive in Bonita; that when she came home from church that day at 1:30 p.m., she found all of the drawers in the exercise room opened and their contents "dumped out" on the floor; that someone had removed the screen from, and entered the house through, a window in the home office; and that "every piece of jewelry" was taken, including items belonging to her husband, and jewelry that belonged to her biological mother.

In summer 2013, and again in about January 2014, when stolen items were recovered from Antar's "store," K.D. and D.D. went to a sheriff's station and identified "quite a few things" that had been taken, including an earring; a gold necklace "without the solitaire"; another necklace; multiple watches; two "[t]ooth fairy" "shaped containers"; a coin from the 1500's; various bracelets and pendants; and company pins.

D.D. testified he was at a doctor's appointment at the time of the November 5 break-in; that he and his wife twice went to property viewings; that he was able to recognize a service pin from his company; a Spanish coin that was missing its golden bezel; a class ring; and some watches that belonged to his grandfathers.

Aguirre recalled the K.D. home from its gate. Aguirre testified that she drove Venegas and Duron to this home in her Cadillac. After she knocked on the front door and nobody answered, Venegas and Duron entered the home.

Cell phone evidence for this date showed an incoming call to Venegas's phone from Antar's phone at 12:11 p.m. lasting one minute 22 seconds; an incoming call from Fults's phone to Venegas's phone at 1:54 p.m. that accessed a tower about a quarter of a mile away from the K.D. residence; an outgoing call from Venegas's phone to Antar's phone at 2:13 p.m. lasting 44 seconds; and an outgoing call from Duron's phone at 2:42 p.m. that connected to a cell tower about a quarter-mile northeast of Antar's "store" located inside the Jewelers Exchange.

A photograph dated November 5, 2012 – the same day the K.D. residence was burglarized – taken at 3:25 p.m. by a smartphone was recovered from Antar's computer. This photograph showed "an assortment of jewelry." Another photograph from this same date also found on Antar's computer showed someone holding a "plastic bag of assorted and loose jewelry." When this photograph was compared side-by-side with a photograph of Venegas's hand, which was tattooed with "'Paulina' and 'Cash Only,'" it appeared there were similarities with respect to the "loop" in the "'y'" in "Only" and the "'h'" in "Cash."

Based on this evidence, we conclude Antar was properly convicted on count 24 of first degree burglary under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 26:

J.B. testified that on November 8, 2012, he resided at a home located on Lavade Lane in Bonita; that when he arrived home from work at about 4:00 p.m., he entered through the front door and found the contents from the front closet on the floor and the living room television set missing; that many items that had been in drawers had been pulled out and thrown on the floor, including in the kitchen and in the bedrooms; and that when he went into the garage, he found his truck, which had "two amps, three speakers, in the back," had been stolen.

Upstairs, J.B. found his wife's jewelry and a large, flat screen television missing. Like many other victims in the burglary ring, J.B. found kitchen knives in areas that had been ransacked. Also missing from the house was his wallet; his wife's tablet; and a .40-caliber firearm.

/ / /

18cv0118 BAS (BGS)

Aguirre testified extensively about the burglary of this particular home. She recalled driving Venegas and Duron to this home and both of them going inside. Sometime later as she waited for them in her Cadillac, Aguirre saw the garage door to the home open and Venegas and Duron leave in a vehicle. Aguirre saw there was a flat screen television inside the stolen vehicle.

Aguirre followed the vehicle in her Cadillac. At some point, they stopped in the Fashion Valley area in front of a white house. According to Aguirre, Venegas stated they were at "Sam's" house. Aguirre testified that as she waited in the Cadillac, she saw but did not talk to "Sam"; that this was the second time she had seen Antar; and that the first time she saw Antar he was exiting the Jewelers Exchange as she, Venegas, and Duron were driving away after Venegas met Antar to exchange loot for money. Aguirre identified Antar in court.

Aguirre recalled that shortly before the tandem drove to Antar's home, they stopped "somewhere near downtown." It was then Aguirre looked in the back of the stolen vehicle and saw it contained an extensive stereo system, which she described as consisting of "speakers" and a "box." During this short stop, Venegas and Duron transferred the stolen flat screen television into the back of Aguirre's car. Aguirre heard Venegas and Duron talking about "stripping" down the stolen vehicle. Aguirre recalled this burglary involved a "military home" based on various stickers or decals on the stolen vehicle.

Although this evidence alone is more than sufficient to support Antar's first degree burglary conviction on count 26, there is more. Cell phone records for this date showed two incoming calls from Antar's phone to Venegas's phone at 11:03 a.m. and at 12:24 p.m.; an outgoing call from Venegas's phone to Antar's phone at 12:42 p.m. lasting one minute three seconds; and an outgoing call from Venegas's phone to Fults's phone at 2:34 p.m. that accessed a tower about a mile west of the J.B. residence.

Phone records further showed an outgoing call from Venegas's phone to Antar's phone at 2:50 p.m. lasting one minute 39 seconds, which accessed a cell tower about a mile west of the J.B. residence. Beginning at 3:27 p.m., the records showed a series of calls involving the phones of Venegas and Antar, including two calls at 4:08 p.m.; another call at 4:23 p.m. lasting one minute 50 seconds; and two more calls at 4:49 p.m., one of which lasted 51 seconds. At 4:54 p.m., there was an outgoing call from Venegas's phone to

Antar's phone that accessed a cell tower about a quarter-mile from the Jewelers Exchange, where Venegas met Antar to swap the loot for money.

In addition, Antar's computer was found to have several photographs taken by a smartphone on November 8, 2012 – the same day the J.B. residence was burglarized – of a flat screen television. A forensic analysis of Antar's computer showed someone had searched the Internet at about 4:15 p.m. that same day concerning the same model of flat screen television shown in the photographs. Also found on Antar's computer were photographs of an equalizer and speaker equipment. Those photographs also were taken using a smartphone and were dated November 9, the day after the J.B. burglary and the theft of the vehicle containing extensive stereo equipment.

Based on this evidence, which is more than sufficient, we conclude Antar was properly convicted on count 26 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Counts 27-32:

Counts 27-32 all took place on November 13, 2012. In connection with count 27, E.M. testified she resided in a home located on Forester Lane in Chula Vista; that on this day she left home around 8:00 a.m. and returned about 1:00 p.m. after bagging groceries for the poor; that on entering her cul-de-sac, she saw for the first time a light-colored Cadillac parked in front of a neighbor's house; and that inside the Cadillac was a female with long dark hair sitting in the driver's seat and a male sitting next to the female.

Once inside the residence, E.M. noticed the screen to the sliding glass door had been opened and her two indoor cats, who normally greeted her on arrival, were "nowhere to be found." As she opened the sliding glass door, E.M. heard a "squeak[ing]" sound coming from the laundry room area. On investigation, she found a pet door on the laundry room door open about five inches. Panicked, E.M. also saw the door from the laundry room, which led outside, ajar.

Inside the master bedroom, E.M. found items scattered on the floor "in disarray." She found her jewelry box almost completely empty except for a pair or two of "cheap earrings." Also missing were her gym bag; money; and tie clips among other items. Like many other victims, E.M.

found kitchen knives in the area that had been ransacked during the break-in, including one knife on a counter near the master bathroom and another knife on the floor, underneath clothing that had been pulled out of the walk-in closet.

C.D. testified in connection with count 28 that she resided in a home located on Bonita View Drive in Bonita; that after being picked up at work that day by her husband, they approached their home and saw a white Cadillac parked next to their driveway; and that C.D. immediately became concerned because a female with long hair was sitting in the driver's seat and the female appeared to be nervous, as her hands were "shaking." According to C.D., as soon as she and her husband drove up, the Cadillac sped off.

Once inside the home, C.D. found items littered on her bedroom floor. C.D. was "shock[ed]" by the condition of her bedroom. Items taken from the house included "a lot of jewelry" including some belonging to her mother, a Rolex watch, a graduation ring, as well as multiple purses and clothes.

About three days after the break-in, C.D. met with detectives. Using a photographic lineup, C.D. identified the female she had seen "shaking" in the Cadillac. The female was later identified as Aguirre. C.D. also identified the white Cadillac from another photograph. C.D. testified she went to a property viewing in 2013, but was unable to identify any items that had been stolen from her home.

Aguirre recalled driving Venegas and Duron to this home in her Cadillac; and that they went inside the home while she waited in the car.

In connection with count 29, R.S. testified that his mother, M., resided in a home on Bonita View Drive in Bonita; that on this day, R.S. drove his mother home and when he opened the front door at about 6:30 p.m., he immediately felt a "draft"; that on inspection, he found the sliding glass door in the dining room open; that when he went into his niece's room, he saw her things had been pulled out of drawers and "thrown all over the floor"; that he found his mother's bedroom in the same condition as his niece's bedroom; that his mother was missing jewelry; and that while they waited for police to arrive, they went outside and discovered the neighbor's house directly across the street (i.e., count 28) also had been burglarized.

///

Aguirre recalled the R.S. home.  She testified she knocked on the front door and, when nobody answered, Venegas and Duron went inside while she kept watch in her Cadillac.  Shortly thereafter, Venegas and Duron returned with "bags" and "purses."  As Venegas and Duron were getting into Aguirre's car, the neighbors who lived across the street came home.  According to Aguirre, Venegas instructed Aguirre to drive off.

J.M. testified in connection with count 30.  J.M. resided at a home located on Paseo Della Vista in Bonita; that he rented a portion of his home to J.St. and J.St.'s wife; that when J.M. returned home midday and went upstairs, he saw the door to J.St.'s room at the end of the hallway had been broken; that when he went into his wife's bedroom, he saw her things had been thrown on the floor; and, like many other homes burglarized during the conspiracy, he found a knife had been left in the area searched during the break-in.  J.M. testified two of his watches were stolen.

J.St. testified he and his wife were living in the J.M. residence on the day of the break-in; that their entrance was separate from the J.M. entrance; that their entire unit had been "totally ransacked"; and that among the items taken from them was a $4,000 12-gauge shotgun that was a collector's item.

Aguirre recalled the burglary of the J.M./J.St. residence.  She testified that she went to the front door, knocked, and nobody answered.  Venegas and Duron next entered the home and were inside for about 30 minutes.  As they were leaving the home, the owner arrived.  Aguirre in response drove her Cadillac down a grassy hill and picked up Venegas and Duron, who had fled down the hill.  Aguirre recalled an "antique shotgun" was taken from this home.

N.L. testified that, in connection with count 31, she resided in a home located on Snaffle Bit Place in Bonita; that she left the house at about 2:15 p.m. to pick up her children at school and returned at about 6:00 p.m.; and that when she pulled into the garage, she noticed cabinet doors open, a car seat from her husband's truck on the garage floor, and the door to her husband's truck open.  On inspection, N.L. saw some boxes in the bed of the truck, which had been full of sports memorabilia, open and their contents disturbed.

Scared, N.L. waited for her husband to arrive before going inside the house.  Once inside, they saw the kitchen window wide open and its screen removed.  Missing from downstairs was a laptop computer.  Upstairs, they

found the master bedroom had been "completely torn apart." Among items taken from the upstairs were jewelry, including wedding rings and wedding bands; her daughter's iPod; and a backpack. As was the case in many of the homes burglarized during the conspiracy, N.L. found a kitchen knife on the bedroom floor, next to the nightstand.

In connection with count 32, D.C. testified that he resided in a home located on Sprinter Lane in Bonita; that at about 2:50 p.m. on this day, he received a call from his alarm company that someone was inside the house; and that as a result of this "emergency," he went home and found the screen covering the master bathroom window removed and the window, which was "[c]losed at all times," open.

After police arrived and secured the home, D.C. went inside and like many other homes burglarized during the conspiracy, found it had been "ransacked" and it looked "like a tornado went through [it]." Items stolen included a laptop computer; jewelry; and a pair of glasses.

Aguirre recalled the D.C. home from its gated doorway.

Phone records for counts 27-32 showed a series of calls that morning between Fults's and Venegas's phones and later, between Venegas's and Antar's phones, including a call involving the latter two phones lasting one minute six seconds. Phone records further showed an incoming call from Venegas's phone to one of Aguirre's phones at 12:38 p.m. that accessed a tower within a few hundred yards of the J.M./J.St. residence (count 30, *ante*); another series of calls about three-quarters of a mile from the C.D. and R.S. residences (counts 28 and 29, respectively); and a call made at 4:01 p.m. from Venegas's phone to Antar's phone lasting 54 seconds, which accessed a cell tower about a quarter-mile east of the Jewelers Exchange, where Antar's "store" was located and where Venegas and Antar would meet to exchange the loot for money.

Based on this record, we conclude substantial evidence supports Antar's convictions on counts 27-32 under a conspiracy theory of vicarious liability. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

/ / /

/ / /

/ / /

18cv0118 BAS (BGS)

Count 33 and 34:

The burglaries charged in counts 33 and 34 took place on November 15, 2012.  M.J. testified that, in connection with count 33, he was residing in a home located on Rio Vista Lane in Bonita; that when he returned home from work that day at about 4:50 p.m. he noticed the front door was unlocked; that when he went through the front door, he heard a "crunching" sound under his feet; and that when he turned the light on, like many other victims of the burglary conspiracy he saw the sliding glass door near the kitchen had been shattered.

On investigation, M.J. saw that "most of the drawers were either opened or thrown on the floor" in his daughter's room and that her clothes "were scattered about."  In the master bedroom, he found a crowbar and shovel had been left near the bed, and many drawers from the dresser had been opened and some thrown on the bed.  Items stolen from the house included his wife's 14–karat gold wedding band; an antique wedding band; and an iPad.

Aguirre recalled this home from the trees and its garage.  Aguirre stated Venegas and Duron entered this house while she waited in her Cadillac.

In connection with count 34, O.T. testified that she and her family resided in a home located on Wheeling Lane in Bonita; that at about 1:00 p.m. that day, she received a phone call from the alarm company informing her that the home alarm had been activated and that police had been dispatched; and that she arrived home about 15 minutes later.  After police cleared the home, O.T. went inside and, as was common in many of the homes burglarized during the conspiracy, found the sliding glass door to a bedroom had been smashed with an object from the garden.  Items stolen included a man's gold watch; at least 15 pairs of earrings including some that were gold; and about $2,000 in cash that was in a briefcase, which also was taken. In January 2014, O.T. went to a sheriff's station and identified the stolen briefcase, which was empty.

Aguirre recalled knocking at the front door of this house, returning to the Cadillac, and Venegas and Duron going inside as she waited in her car.

Per Investigator Holmes, cell phone records for this date showed phone activity involving Venegas's and Duron's phone about a mile south of

the M.J. residence; about a mile and a half south of the O.T. home; and later, about a quarter-mile south of the Jewelers Exchange where Antar's "store" was located.

Based on this evidence, we conclude Antar was properly convicted on counts 32 and 33 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 35:

K.N. testified that on November 28, 2012, she and her family were residing in a home located on Bronco Place in Bonita; that at about 9:30 a.m., a neighbor called and informed K.N. her home alarm was sounding; that when K.N. arrived home with her husband at about 10:00 a.m., she was met by police; and that when they went inside, as was typical of many other homes burglarized during the conspiracy, they found a rock on the floor of the master bedroom and the sliding glass door smashed. K.N. described the bedroom as being in disarray, with clothes thrown on the floor and drawers and a jewelry box opened and emptied. Items taken from the home included not only jewelry, but also a suitcase that was kept in the closet; a leather bag; and a small box that had checks and other items inside.

Aguirre testified that, as she waited in her Cadillac in front of this home, she saw a neighbor watching her as he watered his lawn. Aguirre heard an alarm sound and called Duron and Venegas, but neither answered. Concerned they would be caught, Aguirre drove her Cadillac about three or four houses down the street, out of sight from the neighbor. At some point, another neighbor came outside and, according to Aguirre, "actually chased [Duron] and [Venegas]" down the street. Aguirre then received a phone call from Venegas instructing her to unlock her car doors. She saw Venegas and Duron climb out of a backyard about two houses down from the Nicholas home. Aguirre picked them up and they sped off down some "back streets of . . . [the] Otay Ranch area."

As she drove, Aguirre saw a police car traveling in the opposite direction. When the police car made a U-turn and began following the Cadillac, Venegas told Aguirre not to stop. Aguirre entered a freeway and drove to an area near Southeast San Diego, where one of her friends lived. Aguirre ended up crashing her car as she was being pursued by police. Although Venegas and Duron fled on foot, Aguirre stayed in the car because

///

she was then about three months pregnant with Venegas's child.  As noted *ante*, Aguirre was arrested that same day.

In a search of her car, police found a "pink slip" that had been taken from the K.N. residence; and a handicap placard that had been taken from the vehicle stolen from the P.F. residence (count 18, *ante*).  Also found in Aguirre'' car was a ring inscribed with the name, "[J.A.N.]"; a jewelry box; two pairs of gloves, including one pair of "mechanic-type" gloves; a safe; a wallet; a camera; and three cell phones.  A picture taken from one of Aguirre's cell phones showed Venegas wearing some of the gold chains they had stolen from the L.L. home.

Cell phone records on this date showed an incoming call from one of Aguirre's phones to Venegas's phone at 10:45 a.m. that accessed a tower about a mile from the K.N. residence.  There also was an outgoing and incoming call to Venegas's phone at 11:35 and 11:49 a.m., respectively, that accessed a tower in the same general area.  At 12:24 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting 25 seconds; and an incoming call from Antar's phone to Venegas's phone at 12:30 p.m. lasting 45 seconds.  The 12:24 and 12:30 p.m. calls connected to a cell tower near where the 5 and 15 freeways intersected, in an area also known as "Shelltown."

Following the high-speed chase, an incoming call to Venegas's phone at 3:34 p.m. accessed a cell tower about a quarter-mile from the Jewelers Exchange, where Antar's "store" was located.  At 8:35 p.m. that night, there was an outgoing call from Duron's phone to the phone of Montes, a one-time conspiracy member.

On this record, we conclude ample evidence supports Antar's conviction on count 35 under a conspiracy theory.  (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 37:

C.Ma. testified that on March 11, 2013, she resided in a home located on Del Mar Trails Road in San Diego; that on this day when she returned home and entered through the garage at about 4:00 p.m., she found "bits of glass splattered between the kitchen and the dining room area"; that the front door was open about a foot; and that, like many other victims of the

///

18cv0118 BAS (BGS)

residential burglary conspiracy, a sliding glass door had been shattered to gain entry. C.Ma. also saw a rock from their yard lying on the floor.

Upstairs, C.Ma. found two big drawers to her bureau open and empty. Missing from the drawers were jewelry she had collected for more than 30 years; a teak box that contained letters from her mother; and coins. As was common in the burglary conspiracy, C.Ma. found a pillowcase from a bedroom pillow missing. Other items taken included a laptop computer and a gun owned by her husband.

Phone records from this date showed an incoming call to Fults's cell phone at 1:11 p.m. that accessed cell towers (because of a different technology used by one of the cell providers) anywhere from about a mile to within a few hundred yards of the C.Ma. residence. Beginning at 6:22 p.m., the records also showed a series of calls between Venegas's phone and the phones of Antar and/or Fults.

On this record, we conclude there is substantial evidence in connection with count 37, when considered in light of the whole record, to support Antar's first degree burglary conviction under a conspiracy theory of liability. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 38:

S.D. testified that on March 25, 2013, he lived in a home located on Amberglades Lane in San Diego; that after he returned home from lunch that day, he found a kitchen knife lying on a doormat located just outside the garage door; and that on investigation, he found two safes from two separate closets and a revolver missing. Near one of the closets that had been searched in the break-in, S.D – like so many other victims – found another kitchen knife. Also like many other victims, S.D. found glass from a door had been "shattered," as if someone had "kicked" it in to gain entry into the home.

Besides the safes and revolver, other items stolen from the home included jewelry; a jewelry box; and a computer. Later in 2013, S.D.'s wife identified some documents that had been taken during the burglary; one of the safes that contained the documents; and the revolver that had been inside the safe.

Cell phone records from this date showed a series of calls between 2:39 and 2:44 p.m. involving Venegas's phone that accessed a cell phone tower about half a mile west of the S.D. residence. At 3:48 p.m., there was an incoming call to Venegas's phone from, and, at 4:02 p.m., there was an outgoing call from Venegas's phone to, Antar's phone, both of which accessed a cell tower about a quarter of a mile from Fults's residence. At 5:08 p.m., the records showed Venegas's phone received a call that accessed a cell tower about a quarter-mile from the Jewelers Exchange, where Venegas would meet Antar and exchange the loot for money. At 6:58 p.m., there were four outgoing calls from Venegas's phone to Antar's phone, including one call lasting one minute 13 seconds and another call lasting 34 seconds. At 7:18 p.m., there was another call from Venegas's phone to Antar's phone lasting 42 seconds, which accessed a cell tower about a half-mile east of the Jewelers Exchange.

On this record, we conclude there is more than sufficient evidence to support Antar's conviction on count 38 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 39:

C.G. testified that on April 2, 2013, he was living in a home located on Mustang Ridge Drive in the Carmel Valley area of San Diego; that he left home that day at about 11:15 a.m. and returned at about 12:35 p.m.; that on entry, he found glass on the floor in the breakfast nook area; and that when he entered his home office located at the back of the home, like so many other victims he found someone had used an item from outside (in this case, a stepping stone) to smash the glass in a dual pane door window to gain entry into the home. C.G. found an iPad missing from his office.

After police arrived and cleared the house, C.G. went upstairs and found his nightstand drawer resting on the bed. Missing from the master bedroom was a pearl necklace; a drawer from his late wife's antique jewelry box; about $600 in cash; and a laptop computer.

Cell phone records on this date showed an incoming call from Antar's phone to Venegas's phone at 9:49 a.m. lasting one minute 13 seconds; and an incoming call to Fults's phone at 10:25 a.m. that was connected to a tower about a mile or two from the C.G. residence. At 1:30 p.m., there was an incoming call from Antar's phone to Venegas's phone lasting one minute

18cv0118 BAS (BGS)

six seconds; at 3:39 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting 55 seconds; and at 5:16 p.m., there was an incoming call from Antar's phone to Venegas's phone.

At 10:16 p.m., there was an incoming call from Antar's phone to Venegas's phone that connected to a tower about a half to three-quarters of a mile from the Jewelers Exchange; at 10:20 p.m., there was an incoming call from Antar's phone to Venegas's phone lasting 35 seconds, which accessed a cell tower about a third of a mile north of the Jewelers Exchange; at 10:24 p.m., there was an outgoing call from Venegas's phone to Antar's phone also lasting for 35 seconds; and finally, at 10:30 p.m., there was an outgoing call from Fults's phone.

Based on this substantial evidence, we conclude Antar was properly convicted on count 39 under a conspiracy theory.  (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 40:

E.Z. testified that on April 4, 2013, she resided in a home located on Pine Glen Lane in El Cajon; that when she and her young baby arrived home at about 6:00 p.m., she climbed the stairs only to find a "little box" lying on the ground in the hallway; that she became frightened when she looked into her daughter's room and saw all the dresser drawers open; and that when she went into the master bedroom, she saw her dresser drawers open and found all of her jewelry, which she had collected for more than 18 years, missing. As a result of the burglary, E.Z. refused to remain living in the home.

E.Z. twice went to a property viewing in an attempt to identify items taken during the break-in.  As a result of the viewings, she identified a handbag; a gold watch that belonged to her husband and a similar watch that belonged to her; her wallet and its contents; necklaces and bracelets; earrings; several crosses and a rosary; cuff links; and coins among other items.

Cell phone records from this date showed an outgoing call at 11:25 a.m. from Venegas's phone to Antar's phone lasting about one minute 36 seconds.  That particular call accessed a cell tower about three-quarters of a mile from the E.Z. residence.  Phone records further showed calls between the phones of Venegas and Antar at 12:19 and again at 12:42 p.m. The 12:42 p.m. call accessed a cell tower about a half-mile away from the Jewelers

Exchange where, according to Aguirre and Montes, Venegas would meet Antar and exchange the loot for money.

What's more, a photograph found on Antar's computer taken on April 4, 2013 – the same day as the E.Z. burglary – showed a ring resting on a "gram scale" on a desk inside Antar's office. From the photograph, it appeared someone was in the process of "weighing" the ring.

In light of such evidence, we conclude Antar's conviction on count 40 was proper under a conspiracy theory. (See Covarrubias, supra, 1 Cal.5th at p. 890; Morante, supra, 20 Cal.4th at p. 433; Rodrigues, supra, 8 Cal.4th at p. 1135.)

Count 41:

W.R. testified that on April 16, 2013, he and his wife resided in a home located on Eton Court in Chula Vista; that around 2:30 p.m. that day, he received a telephone call from his children that a door to the home was open; that when he arrived home, he found the door between the garage and kitchen completely broken from its frame; that he noticed his dog walked with a limp and appeared to have a lump on his head; and that right next to the dog door was a "cleaning stick" W.R. typically used to clean the pool.

On inspection, W.R. found that the master bedroom had been "completely tossed"; that the mattress was upside down; and that a safe kept in the closet had been torn from the wall and removed, ostensibly with either a crowbar or shovel, both of which had been left on the closet floor. The contents of the safe included guns; jewelry; money; pictures; documents; and family mementos among other items. Also taken from the house were his daughter's jewelry box; his children's "piggy banks"; an iPad; cameras; and video games. At a property viewing in summer 2013, W.R.'s wife, A.R., identified items taken from the home including their daughter's jewelry box; some of their passports; their son's baby teeth; watches; ammunition; and some jewelry.

A.R. testified that she went to two property viewings in an attempt to identify items stolen from their home. At the first viewing in 2013, she identified her wallet and its contents and a name tag she used for work. At the second property viewing in early 2014, after police searched Antar's "store," she identified several items of jewelry including pearls; rubies that

///

had been removed from a gold setting; a locket; and earrings. A.R. further testified she knew Venegas because he was her nephew.

Phone records from this date showed two incoming calls to Fults's phone at 1:01 and 1:02 p.m., both of which accessed a cell tower about a quarter-mile north of the W.R. residence. Another call within the same general time frame involving Venegas's phone accessed a tower about a mile east of the W.R. home. At 1:41 and 3:03 p.m., there were incoming calls to Venegas's phone from Antar's phone; and at 3:55 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting 35 seconds. At 4:30 p.m., there was an incoming call to Fults's phone that accessed a cell tower about a quarter-mile west of the Jewelers Exchange. Near the same time, there was activity involving Venegas's phone that again accessed a cell tower about a quarter of a mile away from the Jewelers Exchange.

This evidence is more than sufficient to support Antar's conviction on count 41 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 42:

Harvey H.K. testified that on April 18, 2013, he resided in a home located on Willowmere Lane in the Carmel Valley area of San Diego; that during the night while on vacation, San Diego police called and informed him the residence had been burglarized; and that in response, H.K. called his son who lived about a mile away. On inspection, H.K.'s son found the garage door open and police at the residence.

Again, like so many other homes burglarized during the conspiracy, entry into the H.K. home was made through the back of the house by "smash[ing]" a window. Also like most, if not all, of the other burglaries, the master bedroom had been "torn apart" during the break-in. Items taken from the home included a safe weighing about a 100 pounds that had been in the closet in the master bedroom. The contents of the safe included family passports and jewelry among other items.

Also stolen was H.K.'s wife's car. When police found the car in Pacific Beach, its motor was running and its doors were open. Police tracked the car to H.K. When police went to the family home, it was then they discovered the home had been burglarized. In summer 2013, police

///

18cv0118 BAS (BGS)

notified H.K. his safe had been found, including some of its contents such as passports and the pink slips to various cars.

Cell phone records from this date showed an outgoing call from Venegas's phone to Antar's phone at 1:28 p.m. lasting one minute seven seconds, which accessed a cell tower about two and a half miles north of the H.K. residence.

We conclude this evidence, when considered in light of the record as a whole, supports Antar's conviction on count 42 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 43:

C.Mc. testified that in April 2013, she resided in a home located on Central Avenue in Bonita; that on April 1, she left at about 9:50 a.m. and returned about an hour later; that on returning, she found a "cupboard" open in the garage; that when she went inside the home, she found all the drawers in the kitchen had been opened and the back door "propped open" with a "big candleholder" from the patio; and that she immediately left the residence and called police.

After police secured the home, C.Mc. went back inside and found the doorknob to the laundry room door bent, ostensibly as a result of the door being pried open. Upstairs in the bedroom, C.Mc., like so many if not all other homes burglarized during the conspiracy, found it had been "ransacked." C.Mc. testified that many pieces of family jewelry, including items she and her husband had each received from their parents, was stolen.

On April 22, C.Mc.'s home was broken into a second time. At about 3:07 p.m. that day, her husband called and informed her the alarm company had contacted a neighbor because their alarm was sounding. When C.Mc. returned home, she saw a computer and television had been unplugged. Missing from the bedroom was jewelry that had not been taken during the first break-in and original "Barbie" and "Ken" collectible dolls that she stated were "worth quite a bit" of money. As was common in many of the other homes burglarized during the conspiracy, C.Mc. found a pillowcase from a bedroom pillow missing and a "butcher knife" from the kitchen lying on her bed.

///

C.Mc. attended two property viewings at a sheriff's station. She identified a bracelet and a pearl necklace that had been taken during the two break-ins.

Cell phone evidence for this date included more than 63 slides prepared by investigator Holmes involving cell phones used in the conspiracy that connected to cell towers near such locations as the Jewelers Exchange; the Venegas residence; the Fults residence; and the C.Mc. residence in Bonita.

In light of this substantial evidence, we conclude Antar was properly convicted on count 43 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 44:

M.D. testified that on April 23, 2013, he resided in a home located on Mountain Pass Road in San Diego; and that at about 3:00 or 4:00 p.m. that day, his girlfriend returned to the home and found its back door had been "smashed" and glass "everywhere." M.D. immediately came home and met police. On inspection, M.D. saw another window had been smashed and its screen removed.

After the home had been secured, M.D. went inside and found it had been "trashed"; that inside the master bedroom, "everything" had been gone through and thrown about, including the mattress; that a storage chest had been smashed against a wall, damaging both the floor tile and the wall; and that in several of the rooms, things had been taken out and thrown on the floor. Missing from the home was a safe and its contents including a firearm and jewelry. According to M.D., police later recovered papers that also had been in the safe.

Cell phone records from this date showed Fults's phone accessed a cell tower about a half-mile north of the M.D.'s residence. At 1:24 p.m., Venegas's phone made an outgoing call that accessed a cell tower in the same general location as the tower previously accessed by Fults's phone. At 2:36 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting 32 seconds. At 2:40 p.m., there was an incoming call to Venegas's phone from Antar's phone lasting 38 seconds, which accessed a tower about a mile east of the Jewelers Exchange where Antar's "store" was located.

In light of such substantial evidence, we conclude Antar was properly convicted on count 44 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 45:

J.Stu. testified that on May 8, 2013, she resided in a home located on Helix Street in Spring Valley; that when she came home from work at about 7:30 p.m., she discovered her bedroom window had been pried open and her screen had been cut and removed from the window; that everything inside her bedroom had been "tossed" about; that 12 jewelry boxes containing jewelry, coins from around the world, and a knife collection, had been taken; and that three pillowcases were missing from her pillows. In summer 2013 and again in early 2014, J.Stu. went to a sheriff's station and identified items taken from her home including a necklace and bracelet; a gold pin; a travel bag; an arrowhead she had found while hiking; and some of the jewelry boxes – albeit emptied.

Cell phone records for this day showed several calls between the phones of Venegas and Antar, including at 1:28 p.m. lasting 37 seconds; at 1:45 and another at 1:46 p.m., the latter of which lasted 41 seconds; and at 1:56 p.m. lasting 34 seconds. The call at 1:56 p.m. accessed a cell tower located about a quarter-mile from the Jewelers Exchange. At 4:14 p.m., Venegas's phone made an outgoing call to Antar's phone lasting 25 seconds. This call connected to a cell tower about a quarter-mile southwest of the Jewelers Exchange.

From the foregoing, we conclude substantial evidence supports Antar's conviction on count 45 under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 46:

B.C. testified that on May 13, 2013, he was residing at a home located on Helix Street in Spring Valley; that when he arrived home after picking up his son from school, he saw "tire tracks" across his front lawn and two fruit trees knocked down; that when he went to the backyard, he saw the French doors to his bedroom open; and that from the outside, he could see the contents of his bedroom had been "strewn about." On investigation, B.C. found the gun safe inside his bedroom, which weighed about 400 pounds,

had been stolen. Items inside the safe included a rifle; shotgun; a handgun; ammunition; personal documents; about 35 silver coins that both he and his children – using their birthday money – had collected; photographs; and his wife's jewelry.

About a month after the break-in, B.C. went to a sheriff's station and identified "some loose articles" that had been inside the safe. In January 2014, B.C.'s wife went to another property viewing and identified a "Batman 50th anniversary commemorative" silver coin that also had been inside the safe.

Cell phone records for that day showed a call at 11:16 a.m. involving Venegas's phone, which accessed a cell tower about a mile away from the B.C. residence. At 3:36 p.m., there was an outgoing call from Venegas's phone to Antar's phone lasting three minutes 26 seconds.

Based on this evidence, when considered in light of the record as a whole, we conclude Antar's conviction on count 46 was proper under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 47:

S.C. testified that on June 21, 2013, she was residing in a home located on Cypress Del Mar in San Diego; that at about 1:45 p.m. that afternoon, her alarm company called and informed her that a sensor on the front door had been activated; that when she arrived home about 10 minutes later, she walked into her living room and saw her laptop lying on the couch, which she stated was "impossible"; and that the glass door in the dining room was open and the blinds were blowing from the wind. In the kitchen, S.C. found a broken window, glass everywhere, and a footprint on the countertop.

In the master bedroom, S.C. found all the drawers open, with some turned upside down on the ground. Missing from the bedroom were jewelry; an iPad; watches including a Rolex taken from a desk; a rifle; antique coins; a duffle bag; and cash in different currencies. Like many others victimized in the burglary conspiracy, S.C. found a knife had been moved from her kitchen onto a table.

Cell phone records from this date showed at 1:29 p.m. Venegas's phone received an incoming call that accessed a cell tower about three-quarters of a mile west of the S.C. home. At 3:53 p.m., Venegas's phone received an incoming call that accessed a tower about a quarter-mile west of the Jewelers Exchange where, according to his coconspirators, Venegas would meet Antar and exchange the loot for money.

In light of this substantial evidence, we conclude Antar's conviction on count 47 was proper under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 48:

C.B. testified that on July 19, 2013, she lived in a home located on Overpark Road in the Carmel Valley area of San Diego; that she left her home at about 10:00 a.m. and that when she returned at about 12:00 p.m., a police car and her neighbors were waiting outside her home; that after her home was secured, she went inside and found entry into the home had been made from the back patio through a sliding glass door, which like so many other homes that had been burglarized during the conspiracy, had been smashed "into tiny little pieces"; and that, also like nearly all of the other homes burglarized during the conspiracy, the bedrooms had been "ransacked" and everything had been "dumped" on the floor. C.B. also found a kitchen knife in her walk-in closet and another knife on a bed in a guest bedroom.

C.B. testified that all of her jewelry had been dumped into a shopping bag, which she found sitting on the bedroom floor. Although none of her jewelry had been stolen, C.B. lost some Canadian coins she kept in the office.

Cell phone records for this day showed two outgoing calls from Venegas's phone at 10:14 and 10:21 a.m. Both calls accessed a cell tower about three-quarters of a mile from the C.B. residence. At 12:06 p.m., there was an incoming call from Antar's phone to Venegas's phone lasting 13 seconds.

Subsequent DNA analysis of a right shoe found down a hill behind the C.B. home showed Venegas was included as a possible major contributor and was also included as a minor contributor to a right glove that was found on a cinderblock wall near the home.

In light of such evidence, when considered in light of the whole record, we conclude Antar's conviction on count 48 was proper under a conspiracy theory. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890; *Morante*, *supra*, 20 Cal.4th at p. 433; *Rodrigues*, *supra*, 8 Cal.4th at p. 1135.)

Count 49:

As noted, the amended information alleged 157 overt acts that were committed in San Diego County in connection with the conspiracy. Based on the evidence summarized *ante* in connection with each of the above counts, we conclude there is more than sufficient evidence to show Antar and Venegas, along with Duron and/or Fults, "positively or tacitly came to a mutual understanding to commit" the crime of first degree residential burglary, or attempted residential burglary (see *Rodrigues*, *supra*, 8 Cal.4th at p. 1135), as evidenced through their "conduct, relationship, interests, and activities" both before and during the conspiracy (see ibid.).

This same evidence further shows that at least one such individual committed at least one (if not all) of the overt acts in furtherance of the residential burglary conspiracy. (See *Rodrigues*, *supra*, 8 Cal.4th at p. 1135; see also *People v. Swain* (1996) 12 Cal.4th 593, 600 [noting a conspiracy requires two or more persons agreeing to commit a crime, along with the commission in California of an overt act by at least one of these persons in furtherance of the conspiracy]; § 182, subd. (a)(1).) Thus, we conclude Antar's conviction on count 49 was supported by substantial evidence. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 890.)

(Lodgment No. 1, ECF No. 12-1 at 12-70.)

## III. **PROCEDURAL BACKGROUND**

On July 10, 2015, the San Diego County District Attorney's Office filed an Amended Information charging Sami Hanna Antar and three other defendants with forty-six counts of first degree burglary (counts 1-13, 15-21, and 23-48), two counts of attempted burglary (counts 14 and 22), and one count of conspiracy to commit residential burglary (count 49). (Lodgment No. 9, ECF No. 12-9 at 123-61.) Antar was also charged with possession of stolen property (count 50). (*Id.* at 154.) Following a jury trial, the trial court granted a motion made pursuant to Penal Code § 1118.1 and dismissed counts 10, 21 and 36. (Lodgment No. 29, ECF No. 12-29 at 121.) Antar was

acquitted of count 25 but was convicted of all the remaining counts. (Lodgment No. 10, ECF No. 12-9 at 89-93.) He was sentenced to twenty-two years and eight months in prison. (*Id*. at 89.)

Antar appealed his conviction to the California Court of Appeal, Fourth Appellate District. (Lodgment Nos. 5-7, ECF Nos. 12-5 – 12-7.) The state appellate court affirmed Antar's convictions in a 2-1 decision. Justice O'Rourke dissented. (Lodgment No. 1, ECF No. 12-1.)

Antar filed a Petition for Review in the California Supreme Court. (Lodgment No. 2.) The California Supreme Court denied the Petition without citation of authority. (Lodgment No. 3, ECF No. 12-3.)

Antar then filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on January 18, 2018. (ECF No. 1.) Respondent filed an Answer and lodgments on May 17, 2018. (ECF Nos. 11-12.) Antar filed a Traverse on June 18, 2018. (ECF No. 16.)

## IV.  **DISCUSSION**

Antar alleges there was insufficient evidence to convict him of residential burglary, attempted residential burglary and conspiracy to commit residential burglary. (Pet., ECF No. 1. at 6.) Respondent contends the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 11.)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.

28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). Clearly established federal law, for

///

purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

Although Antar never entered any of the burglarized houses, he was convicted of forty-two counts of residential burglary and two counts of attempted residential burglary via a charged conspiracy to commit residential burglary theory. (Lodgment No. 10, ECF No. 12-10 at 211-57.) Antar does not contend there was insufficient evidence to establish that the homes in question were burglarized by his codefendants or that there was insufficient evidence his codefendants conspired to commit those burglaries. Nor does he challenge his conviction for possession of stolen property. Rather, Antar contends there was insufficient evidence to establish he was either a member of the conspiracy or that he aided and abetted the burglaries. (Pet., ECF No. 1 at 6.) Respondent contends the state court's resolution of Antar's claims are neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 11-1 at 46-60.)

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364 (1970)). On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation. *Id.* In assessing a sufficiency of the evidence claim, a state court must apply the standard announced by the Supreme Court in *Jackson v. Virginia*, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). While circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ." *Juan H.*, 408 F.3d at 1279; *see also Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217-18 (9th Cir. 2018); *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("mere suspicion or

speculation cannot be the basis for logical inferences"). Moreover, under AEDPA "the standards of *Jackson* are applied 'with an additional layer of deference,' requiring the federal court to determine 'whether the decision of the [state court] reflected an "unreasonable application of" *Jackson* . . . to the facts of this case.'" *Maquiz*, 2018 WL 5780729 at *4 (internal citations omitted). A federal habeas court must "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'" *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (1992)). Deference under AEDPA, however, "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n. 16; *Juan H.*, 408 F.3d at 1276. In the present case, because the state appellate court found there was substantial evidence presented at trial establishing Antar's membership in a conspiracy to commit residential burglary, and that he was therefore guilty of all the burglary counts, the Court will first address the sufficiency of evidence for the conspiracy conviction.

### 1. *Sufficiency of Evidence of Conspiracy to Commit Burglary*

Both parties agree that under California law, "[a] conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." *People v. Morante*, 20 Cal. 4th 403, 416 (1999); *People v. Vega-Robles*, 9 Cal. App. 5th 382, 420 (2017). "Conspiracy is a specific intent crime requiring both an intent to agree or conspire and a further intent to commit the target crime or object of the conspiracy. It is a dual mental state." *People v. Iniguez*, 96 Cal. App. 4th 75, 78 (2002) (footnote omitted). A defendant need not, however, intend to commit the target crime himself. Rather, he must intend that one or

more of the members of the conspiracy commit the target crime. CALCRIM No. 415. In this case, the target crime was residential burglary. A person commits the crime of residential burglary when he or she enters a house with the intent to commit a theft or felony. Cal. Penal Code § 459 (West 2018).

"To prove an agreement, it is not necessary to establish the parties met and expressly agreed [to commit the target offense]." *People v. Vu*, 143 Cal. App. 4th 1009, 1025 (2006). "The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime." *People v. Prevost*, 60 Cal. App. 4th 1382, 1399 (1998). The existence of a conspiracy "may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." *Id.*

"It is settled that mere association and suspicion of criminal conduct is not enough to establish a conspiracy or even an agreement; there must be some evidence to demonstrate that the association is also a conspiracy." *People v. Tran*, 215 Cal. App. 4th 1207, 1221 (2013). Neither "knowing that a person's products or services are being used for a criminal purpose," *People v. Powers-Monachello*, 189 Cal. App. 4th 400, 419 (2010), nor "a defendant's mere acceptance of the benefits of a criminal activity after it has occurred," *People v. Hardeman*, 244 Cal. App. 2d 1, 52-52 (1966), is sufficient by itself to establish a defendant's participation in a conspiracy. However, "[w]here there is some evidence that a person participated in committing the target offense or had an interest in its commission, such evidence together with evidence of association can be sufficient to support an inference of a conspiracy to commit that offense." *Tran*, 215 Cal. App. 4th at 1221-22; *Prevost*, 60 Cal. App. 4th at 1400, quoting *People v. Hardeman*, 244 Cal. App. 2d 1, 41 (1966).

This Court is required to determine whether the state appellate court's decision affirming Antar's conviction was an unreasonable application of *Jackson*, that is, whether the state court unreasonably determined that, viewing the evidence in the light most favorable to the prosecution, and all reasonable inferences that may be drawn from this

48

evidence, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. In other words, to survive a due process challenge, the record of conviction must support the state court's determination that sufficient evidence was presented to allow any reasonable fact finder to conclude that: (1) Antar had the specific intent to agree and did agree to commit residential burglary, (2) Antar had the specific intent to commit the residential burglary himself or the specific intent that a member of the conspiracy commit burglary; and (3) an overt act in furtherance of the conspiracy was committed by one or more of the members of the conspiracy. *Id.*; *Morante*, 20 Cal. 4th at 416; CALCRIM No. 415

The prosecution presented both direct and circumstantial evidence sufficient to establish Venegas, Duron and Fults were in a conspiracy to commit residential burglary, that is, they "had the specific intent to agree or conspire to commit [residential burglaries], as well as the specific intent to [enter each of the homes with the intent to steal property]," and that one or more of them committed an overt act in furtherance of the conspiracy. *Vega-Robles*, 9 Cal. App. 5th at 420. Montes testified Duron approached him in mid-August of 2012 and asked Montes drive Duron and Venegas around so they could scout houses for residential burglaries. (Lodgment No. 16, ECF No. 12-16 at 59.) Montes drove Venegas and Duron to various houses which they burglarized and shared in some of the proceeds of the burglaries. (*Id.* 75-98.) At trial, Montes identified some of the houses he helped burglarize as well as various items that were stolen from those houses. (*Id.*) Near the end of August 2012, Montes was stopped by police and his car was searched. Jewelry from some of the burglaries and a pawn receipt for some stolen jewelry were found in his car. (*Id.* at 99-101.) He was arrested in April of 2013 and later began cooperating with police. (*Id.* at 105-06.)

Aguirre testified about the residential burglaries she participated in with Venegas, Montes and Duron beginning in July of 2012 and continuing until her arrest in November of that year. (Lodgment No. 25, ECF No. 12-25 at 124-88.) Aguirre acted as a driver and a lookout; she also entered at least one of the houses and stole items from it. (*Id.*)

49

She identified many of the houses she helped burglarize as well as items that were taken from the homes. (*Id.*) She also testified she and Venegas would communicate via text and cell phone during the burglaries about which doors she should knock on to determine whether anyone was home, where she was parked and at least once to ask why he was taking so long inside a house. (Lodgment No. 26, ECF No. 12-26 at 15.)

Having established there was a conspiracy to commit residential burglary among Venegas, Duron and Fults, the prosecution sought to tie Antar to it. District Attorney Investigator Don Holmes testified regarding the cell phone evidence. The records showed calls between Venegas's phone and Antar's phone, many of which were made before and/or after each burglary. (Lodgment No. 23, ECF No. 12-23 at 157-96, ECF No. 12-24 at 8-86; ECF No. 12-25 at 26-113.) The cell phone evidence also showed that Venegas's phone was downtown near Antar's shop after many of the burglaries. (*Id.*) In addition, jewelry from some of the burglaries was found at Antar's shop and photos of some of the stolen jewelry was found on Antar's computer. (Lodgment No. 19, ECF No. 12-19 at 111-26; Lodgment No. 20, ECF No. 12-20 at 95-101; Lodgment No. 21, ECF No. 12-21 at 81-85, 111-12; Lodgment No. 22, ECF No. 12-22 at 96-97; Lodgment No. 23, ECF No. 12-23 at 128-29; Lodgment No. 25, ECF No. 12-25 at  Lodgment No. 28, ECF No. 12-28 at 86-98, 121-48, 135, 174-75.) The photos were taken on the same dates as the burglary of the home from which the jewelry was taken. (*Id.*) Police also found evidence of searches conducted on Antar's computer regarding the value of the same kind of electronics stolen during the burglaries. (Lodgment No. 27, ECF No. 12-27 at 179-84; Lodgment No. 28, ECF No. 12-28 at 135.) In addition, testimony from Montes and Aguirre established that after the burglaries they participated in, Venegas texted or called Antar, they would drive downtown to Antar's shop, Venegas would enter the building where Antar's shop was located and return with cash. (Lodgment No. 16, ECF No. 12-16 at 77-82; Lodgment No. 25, ECF No. 12-25 at 131, 139-42.) Finally, Aguirre testified that she, Venegas, and Duron drove a car stolen during one of the burglaries to

/ / /

Antar's home where Venegas and Duron talked to each other about stripping the car and selling the parts to Antar. (Lodgment No. 25, ECF No. 12-25 at 169-71.)

As discussed above, there is no question that Venegas, Duron and Fults specifically intended to agree to commit residential burglary, specifically intended that one or more of them commit residential burglary, and that one of them committed an overt act in furtherance of the conspiracy. The issue presented to this Court is whether, resolving all reasonable inferences in favor of the prosecution, any rational trier of fact could have concluded on this record that Antar specifically intended to agree to commit residential burglaries with Venegas and/or other people and that he specifically intended that one or more members of the conspiracy commit residential burglary. Inferences made from the facts must be not only reasonable but must be supported by evidence in the record. *See Walters*, 45 F.3d at 1358.

The crime of conspiracy fixes the point of criminal liability at the point of agreement, not the point of the commission of the target crime. *People v. Swain*, 12 Cal. 4th 593, 600 (1996). "A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances." *People v. Vargas*, 91 Cal. App. 4th 506, 555 (2001) quoting *People v. Jones*, 180 Cal. App. 3d 509, 517 (1986). Here, the direct and circumstantial evidence presented at trial, and the reasonable inferences that could be drawn from that evidence, was sufficient to establish beyond a reasonable doubt that Antar entered into a conspiracy, the object of which was for Venegas and his crew to commit residential burglaries and for Antar to fence the proceeds from those burglaries. As noted above, "[t]he existence of a conspiracy "may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." *Prevost*, 60 Cal. App. 4th at 1399. Antar's conduct of repeatedly communicating with Venegas by phone while Venegas was in close proximity to the location of the burglaries and close in time to when the burglaries were

committed, as well as Venegas's repeated visits to Antar's business to pawn the proceeds of the burglaries could lead a rational juror to conclude that Antar had agreed conspired with Venegas for Venegas and his crew to commit residential burglaries and for Antar to fence the stolen property. In addition, the presence of photographs of the stolen property on Antar's computer and evidence of computer searches regarding the value of some of the stolen property could lead a reasonable juror to conclude that Antar was a knowing and willing participant in the conspiracy. The nature of the goods Venegas brought to Antar's business for him to fence – personal pieces of jewelry, sports memorabilia, coins, electronics, etc. – could lead a rational juror to conclude that Antar knew or should have known the goods Venegas brought him to pawn were stolen property obtained from committing residential burglaries. Moreover, Antar's willingness to act as a fence for Venegas for a lengthy period of time could lead a rational juror to conclude that Antar and Venegas had an ongoing relationship with a mutual interest in Venegas committing residential burglaries so both could profit. Given Antar's willingness to fence goods he knew or should have known were stolen and the financial benefit Antar enjoyed as a result of Venegas's criminal activity, a rational juror could conclude that Antar intended to conspire with Venegas, Duron and Fults to commit residential burglaries and that he intended that Venegas and crew continue to commit residential burglaries in order to profit from them. *See Prevost*, 60 Cal. App. 4th 1382, 1399 (1998); *see also Tran*, 215 Cal. App. 4th at 1221-22 ("[w]here there is some evidence that a person participated in committing the target offense or had an interest in its commission, such evidence together with evidence of association can be sufficient to support an inference of a conspiracy to commit that offense").

Applying the doubly deferential review required by AEDPA, the Court concludes that state appellate court's determination there was substantial evidence to support the jury's conclusion that Antar was guilty of conspiracy to commit burglary and burglary was not an unreasonable application of *Jackson*. Nor was it based on an unreasonable

/ / /

determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly he is not entitled to relief. *Yarborough*, 540 U.S. at 4.

### 2. *Aiding and Abetting*

Because the state appellate court concluded there was sufficient evidence to convict Antar of residential burglary as a conspirator, it did not address Antar's claim that the evidence was insufficient to convict him of residential burglary under an aiding and abetting theory. (Lodgment No. 1, 12-1 at 9.) This Court must therefore review the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003) (where there is no state court decision on a claim to which the federal court can defer, the Court must conduct a de novo review of the claim).

The California Supreme Court has stated that "a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." *People v. Beeman*, 35 Cal.3d 547, 561 (1984); CALCRIM No. 401. To prove a defendant aided and abetted a crime, the prosecution must establish the following:

> (a) the direct perpetrator's actus reus – a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea – knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus – conduct by the aider and abettor that in fact assists the achievement of the crime.

*In re J.R.*, 22 Cal. App. 5th 805, 814 (2018).

California courts have held that in order to impose liability on a defendant for aiding and abetting a crime, "the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.'" *People v. Joiner*, 84 Cal. App. 4th 946, 967 (2000) (quoting *People v. Montoya*, 7 Cal. 4th 1027, 1039 (1994) (emphasis in original)). "[F]or the purpose of assessing the liability of an aider and abettor, a burglary is considered ongoing during the time the

perpetrator remains inside the structure . . . ." *Montoya*, 7 Cal. 4th at 1045. However, "the mere knowledge or belief that a crime is being committed or likely to be committed, and the failure on the part of one having such knowledge or belief to take some steps to prevent it, in no sense amounts to aiding and abetting." *People v. Weber*, 84 Cal. App. 2d 126, 130 (1948). California courts have discussed the distinction between aiding and abetting and other, lesser crimes:

> [I]t is essential to distinguish the act and intent that constitute "aiding and abetting" the commission of a crime, from conduct that will incur the lesser liability of an "accessory" to the crime – defined as conduct by one who "*after a felon has been committed* . . . aids a principal in such felony . . . ." (*Ibid.*) In this respect, not only must the subjective intent to encourage or facilitate the actions of the perpetrator be formed prior to or during the commission of the offense, if there is no participation in the planning, the aider and abettor must take affirmative action at the time the offense is committed. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to crimes, § 83, pp. 98-99.) "To be an abettor the accused must have instigated or advised the commission of the crime or been present for the purpose of assisting in its commission." (*People v. Villa* (1957) 156 Cal. App.2d 128, 133-134, 318 P.2d 828.)

*Joiner*, 84 Cal. App. 4th at 967 (emphasis in original).

As discussed above in section IV(B)(1), there was sufficient evidence to establish the direct perpetrators, Venegas, Fults and Duron, committed the crime of burglary. The question the Court must answer is whether sufficient evidence was presented to establish that Antar knew Venegas, Fults and Duron intended to commit burglary, that he intended to "assist in achieving those ends," and that he committed an act that helped Venegas, Fults and Duron to commit burglary. *See In re J.R.*, 22 Cal. App. 5th at 814.

Although there was circumstantial evidence suggesting Antar knew or should have known the jewelry he was obtaining from Venegas was stolen, for the reasons discussed above the evidence presented at trial was insufficient to support a reasonable inference that Antar intended to commit, encourage or facilitate the burglaries themselves or that he did anything to help Venegas and his crew commit the burglaries. As discussed above, no evidence, direct or circumstantial, was presented regarding what Venegas and Antar

discussed, either during the phone calls or when Venegas went to Antar's shop to pawn stolen items. There was no evidence, direct or circumstantial, Antar knew where Venegas was or what he was doing during the phone calls, whether or how the property was stolen, and from where it was stolen. There was no evidence presented, direct or circumstantial, that Antar did anything that advanced or facilitated the burglaries or that established Antar intended to advance or facilitate them. Thus, no logical or reasonable inference could be drawn that Antar aided and abetted the burglaries, and any such conclusion would be based upon "mere suspicion," "[s]peculation and conjecture." *Juan H.*, 408 F.3d at 1279; *Lewis*, 787 F.2d at 1323.

An argument could be made that Antar intended to encourage or facilitate the burglaries and promoted or encouraged them by acting as a fence for Venegas. But no evidence was presented that Antar participated in the planning of the burglaries and thus under California law, the prosecution was obliged to establish that Antar "[took] affirmative action at the time the offense [was] committed." *Joiner*, 84 Cal. App. 4th at 967. As previously noted, "a burglary is considered ongoing during the time the perpetrator remains inside the structure . . . ." *Montoya*, 7 Cal. 4th at 1045. The only evidence presented showing that Antar did anything while the burglaries were in progress was phone calls between him and Venegas. The prosecution did not establish, however, that the phone calls occurred during the commission of the burglaries, nor did it establish with either direct or circumstantial evidence the content of the conversations between Antar and Venegas. Thus, Antar's act of fencing the stolen property *after* the burglaries were complete cannot form the basis for aiding and abetting liability under California law. Accordingly, the evidence was insufficient to support Antar's conviction for residential burglary as an aider and abettor. *Jackson*, 443 U.S. at 310

## V. **CONCLUSION**

The Court submits this Report and Recommendation to United States District Judge Cynthia A. Bashant under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

1

 **IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving

2

and adopting this Report and Recommendation, and (2) directing that Judgment be

3

entered **DENYING** the Petition for Writ of Habeas Corpus.

4

 **IT IS ORDERED** that no later than **January 7, 2019** any party to this action may

5

file written objections with the Court and serve a copy on all parties. The document

6

should be captioned "Objections to Report and Recommendation."

7

 **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

8

the Court and served on all parties no later than **January 21, 2019**. The parties are

9

advised that failure to file objections within the specified time may waive the right to

10

raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d

11

449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

12

 **IT IS SO ORDERED.**

13

Dated: December 14, 2018

14

Hon. Bernard G. Skomal

15

United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28